**Ralph NADER, Candidate for President of the United States; Stephen E. Smaha; Suzanne Russo; and Lucretia Krause, Plaintiffs,**

v.

**Geoffrey S. CONNOR, Secretary of State for the State of Texas, Defendant.**

**No. A–04–CA–264–LY.**

United States District Court, W.D. Texas, Austin Division.

Sept. 1, 2004.

James C. Linger, Butler & Linger, Tulsa, OK, John Charles Kitchens, Austin, TX, for Plaintiffs.

Edward D. Burback, Deputy Attorney General of Texas, Austin, TX, for Defendant.

## MEMORANDUM OPINION

YEAKEL, District Judge.

Plaintiffs Ralph Nader, an independent candidate for office of president of the United States, and three individual Texas voters and supporters of Nader for president,[1] filed suit against Defendant Geoffrey S. Connor, Secretary of State for the State of Texas (the "Secretary of State") seeking declaratory and injunctive relief pursuant to sections 1343, 2201, and 2202 of Title 28 of the United States Code [2] and the Civil Rights Act of 1871 [3] to invalidate sections 192.032(a), 192.032(b)(3)(A), 192.032(c), and 192.032(d) of the Texas Election Code,[4] as applied to Nader for the 2004 Texas general election and all subsequent general elections in Texas, as illegal and unconstitutional. Nader contends that the election code provisions violate his rights under the First and Fourteenth Amendments to the United States Constitution [5] and discriminate against independent presidential candidates in violation of the Civil Rights Act.[6] Nader also seeks preliminary [7] and permanent injunctions restraining, prohibiting, and enjoining the Secretary of State from enforcing, applying, or implementing the aforementioned sections of the Texas Election Code, and an order from this Court placing Nader,

---

1. Plaintiffs Stephen E. Smaha, Suzanne Russo, and Lucretia Krause are identified as "registered voters in the State of Texas and willing to serve as presidential electors in Texas for Ralph Nader as an independent candidate for President of the United States." As their interests do not diverge from those of Nader, "Nader" will be used to identify Ralph Nader individually and all Plaintiffs collectively. The particular use will be apparent from the context.

2. 28 U.S.C. §§ 1343 (1993); 28 U.S.C. §§ 2201, 2202 (1994).

3. 42 U.S.C. § 1983 (2003).

4. Tex. Elec.Code Ann. §§ 192.032(a), 192.032(b)(3)(A), 192.032(c)-(d) (West 2003).

5. U.S. Const. amend. I, XIV.

6. 42 U.S.C. § 1983 (2003).

7. The parties proceeded to trial on the merits by agreement without a hearing on Nader's motion for preliminary injunction (Doc. # 4). The Court dismisses that motion as moot.

his vice-presidential running mate, and his presidential electors on the Texas ballot for the general election in 2004.[8]

## I. The Controversy

The Texas Election Code recognizes three classifications of political parties, which the Secretary of State labels for descriptive purposes in his filings before this Court as "major," "medium," and "minor." Major political parties (those whose nominee for governor received twenty percent or more of the total votes cast for governor in the most recent Texas gubernatorial general election) must nominate candidates through a statewide primary election. TEX. ELEC.CODE ANN. § 172.001 (West 2003). Medium political parties (those whose nominee for governor received more than two but less than twenty percent of the total votes cast for governor in the most recent Texas gubernatorial general election) may choose to nominate candidates through either a primary election or through nominating convention. Id. § 172.002(a). In 2004 Texas's general and presidential primary elections were held on March 9. Act of Oct. 13, 2003, 78th Leg., 3d C.S., ch. 1, § 6(a)(2), 2003 Tex. Sess. Law. Serv.3d C.S., ch. 1 (H.B.1).

Minor political parties (those receiving less than two percent of the total votes cast in the most recent Texas gubernatorial general election or having not fielded a gubernatorial candidate in such election) must nominate candidates by convention. TEX. ELEC.CODE ANN. § 181.003 (2003). To have its nominees placed on the ballot, a party must file with the Secretary of State lists of its precinct-convention participants totaling at least one percent of the total number of votes received by all candidates for governor in the last Texas gubernatorial general election. Id. § 181.005(a). If the political party does not secure sufficient participation at its precinct conventions to qualify to have its nominees placed on the general-election ballot, the party may qualify by filing with the Secretary of State a petition supplementing its precinct-convention participants and containing a sufficient number of signatures that, when added to the number of precinct-convention participants, equals at least one percent of the total number of votes received by all candidates for governor in the most recent gubernatorial general election. Id. § 181.006. In 2004 that number is 45,540. A minor political party must file its lists and supplemental petition not later than the seventy-fifth day after the date of its precinct conventions. Id. § 181.005(a), .006(b)(3). A party must hold its precinct conventions on the second Tuesday in March, id. § 181.061(c), the same day as the primary election. In 2004 the filing deadline was May 24, which was actually seventy-six days from March 9 due to the fact that the seventy-fifth day (May 23) fell on a Sunday.

An independent candidate, such as Nader, is not subject to a primary, nor must he be nominated through the convention process. An independent presidential candidate qualifies for placement on the ballot in Texas by filing with the Secretary of State an application and petition containing signatures equal in number to at least one percent of the total votes received in Texas by all candidates for president in the most recent presidential general election. Id. § 192.032(d). In 2004 the number of petition signatures required is 64,076. The application and accompanying petition must be filed with the Secretary of State not later than the second Monday in

---

8. In the alternative, Nader seeks this Court's order allowing him until May 24, 2004, to gather additional petition signatures in order to meet the signature number requirement of independent presidential candidates, see TEX. ELEC.CODE ANN. § 192.032, or the lesser number of signatures required for new political parties, see id. §§ 181.005, .006.

May of the presidential election year. *Id.* § 192.032(c). In 2004 the filing deadline was May 10.

Neither a minor political party nor an independent candidate may obtain petition signatures until the day after the primary election. *Id.* § 181.006(j) (petition may not be circulated until after date of party's precinct convention; signature obtained on or before that date invalid); § 192.032(g) (signature invalid if signer signs petition on or before date of presidential primary election). The signer of the petition must not have voted in the general or runoff primary election. *Id.* § 142.009. Signatures must meet these requirements to qualify to be counted by the Secretary of State.

These election code provisions yield the following with regard to the controversy before this Court. In 2004 an independent candidate for president was required to obtain 64,076 qualified petition signatures between March 10 and May 10, a period of sixty-two days, to obtain a place on the general-election ballot. A minor political party in 2004 was required to obtain but 45,540 qualified petition signatures between March 10 and May 24, a period of seventy-six days, to place its candidate for president on the same ballot.[9] Thus, an independent candidate is required to obtain more signatures than a minor political party, but is allowed fewer days to obtain the signatures to achieve a place on Texas's general-election ballot.

Nader, a Connecticut resident, announced his candidacy as an independent candidate for president of the United States on February 22, 2004. He asserts that his Texas supporters collected "petition signatures totaling over 50,000" by the May 10, 2004 independent presidential-candidate deadline. However, he did not submit his petition signatures to the Secretary of State on that date. Instead, he turned in his petitions, containing a total of 80,044 signatures, on May 24, 2004.

Nader thus presents these assertions to the Court. He attained in excess of 50,000 petition signatures (more than the 45,540 precinct-convention participants and supplemental-petition signatures required of minor parties, but fewer than required of an independent candidate) by the independent-candidate filing deadline of May 10, but did not present them to the Secretary of State until May 24, the final day that a minor party could submit its signatures, when he presented petitions containing 80,044 signatures, more than enough signatures, he contends, to satisfy the independent-candidate filing requirements of the Texas Election Code. Assuming that Nader obtained at least 64,076 qualified signatures, he has satisfied the signature requirement for an independent candidate, but filed the signatures with the Secretary of State two weeks after his deadline established by the election code; he would have satisfied both the signatures required and the presentation deadline for minor political parties.[10]

Nader and the Secretary of State join issue over whether, in order to obtain a place on the general-election ballot, the requirement that an independent candidate for president obtain more signatures in fewer days than a minor political party unduly burdens and restricts the First and

---

**9.** Forty-five thousand five hundred forty is the outside limit required. The actual number may be much less, depending on the party's precinct-convention participation.

**10.** A July 5, 2004 report of a sampling of the signatures submitted in support of Nader by an expert retained by the Secretary of State concluded that between 56,215 and 63,374 *qualified* signatures were submitted on May 24, 2004, short of the 64,076 qualified signatures requested of an independent candidate for president.

Fourteenth Amendment rights of Nader and his supporters, and violates his civil rights by discriminating against him in favor of the candidates of minor political parties.

This Court held a bench trial on July 22, 2004. The parties filed and the Court accepted Joint Stipulations of Fact (Doc. # 15) and Supplemental Joint Stipulations of Fact (Doc.# 19) with regard to all substantive issues before the Court. *See* FED. R. CIV. P. 52(a). The Court, having considered the pleadings in this cause, the parties' stipulations, the testimony of Nader's witness, Linda Curtis, concerning the difficulty Nader encountered in obtaining signatures, and the briefs and argument of counsel, concludes that sections 192.032(a), 192.032(b)(3)(A), 192.032(c), and 192.032(d) of the Texas Election Code pass constitutional muster for the following reasons.

## II. Analysis

### A. Level of Scrutiny

■ Nader challenges the constitutionality and legality of these portions of the Texas Election Code on the ground that the disparity between the signature requirements and the signature deadlines for independent candidates and those for minor political-party candidates is discriminatory and unconstitutionally burdensome to independent candidates.[11] Courts have long recognized that candidate-eligibility requirements in state election laws implicate fundamental constitutional rights. *See Anderson v. Celebrezze,* 460 U.S. 780, 786, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraced freedom of speech." *Id.* at 787, 103 S.Ct. 1564

(quoting *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)). Ballot-access restrictions place burdens on two kinds of rights—the right of individuals to associate for the advancement of political beliefs and the right of qualified voters of all political persuasions to cast their votes effectively. *Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

However, not all restrictions imposed by the states on candidates' ballot access impose constitutionally suspect burdens on voters' rights to associate or choose among candidates. *Anderson,* 460 U.S. at 788, 103 S.Ct. 1564. States are granted authority to substantially regulate elections to ensure that they are fair, honest, and orderly through the enactment of election codes. *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). These codes affect to some degree the individual's right to vote and to associate with others for political ends, but the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions. *Anderson,* 460 U.S. at 788, 103 S.Ct. 1564.

Signature requirements and the deadlines for submitting signatures have been upheld as constitutional. *See Norman v. Reed,* 502 U.S. 279, 295, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992) (upholding signature requirements); *American Party v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) (upholding both signature requirements and deadline for obtaining signatures); *Storer,* 415 U.S. at 745–46, 94 S.Ct. 1274 (upholding signature requirements); *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (upholding signature requirements); *Texas Indep.*

11. Nader compares independent candidates and "new" political parties. The new political parties he describes are the same as the minor political parties discussed in this opin-ion. Therefore, this Court will refer to the two as "independent candidates" and "minor political-party candidates."

*Party v. Kirk,* 84 F.3d 178, 186 (5th Cir. 1996) (upholding early May deadlines for submitting petition signatures). Indeed, the Supreme Court has recognized that "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates." *Anderson,* 460 U.S. at 788, 103 S.Ct. 1564. Thus, if the signature requirements and the deadline for submitting signatures for independent presidential candidates under the Texas Election Code were reviewed in isolation, precedent would support upholding both as constitutional.[12]

Requiring that an independent presidential candidate demonstrate that voters equal in number to one percent of those who voted for president in the last presidential election favor placing the candidate on the ballot, does not place an unreasonable burden on the candidate and satisfies the state's legitimate interest in "assur[ing] itself that the candidate is a serious contender truly independent, and with a satisfactory level of community support." *Storer,* 415 U.S. at 746, 94 S.Ct. 1274 (footnote omitted). And it is not unduly restrictive or unreasonable that the number of signatures required of an independent presidential candidate be linked to the votes cast in a presidential election. The presidency is the only office being sought by that candidate.

However, the United States Supreme Court also speaks of assessing the "totality" of the election laws as they affect constitutional rights when "a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights." *Storer,* 415 U.S. at 737, 94 S.Ct. 1274 (discussing *Williams v. Rhodes,* 393 U.S. 23, 34, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)). In *Storer,* the Supreme Court recognized that "the requirements for an independent's attaining a place on the general election ballot can be unconstitutionally severe," therefore requiring inquiry "as to the nature, extent, and likely impact" of the election law requirements. *Id.* at 738, 94 S.Ct. 1274.

After its decision in *Storer,* the Supreme Court in *Anderson* and *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) established a framework for examining state ballot-access laws. Under *Anderson,* a court must weigh the character and magnitude of the injury to the rights protected by the First and Fourteenth Amendments against the state's interests in justifying the requirements imposed by its election laws. *Anderson,* 460 U.S. at 789, 103 S.Ct. 1564. The level of scrutiny applied to the state's requirements depends on the extent to which the challenged regulation burdens First and Fourteenth Amendment rights. *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059; *Kirk,* 84 F.3d at 182. If the state's requirements severely restrict those rights, then the requirements may be upheld only if they are narrowly tailored to advance a compelling state interest. *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059; *Kirk,* 84 F.3d

---

**12.** As previously noted, a July 5, 2004 report of a sampling of the signatures submitted in support of Nader by an expert retained by the Secretary of State has concluded that only between 56,215 and 63,374 qualified signatures were submitted on May 24, 2004. *See supra* note 10. It could be argued that this Court need not go any further in its analysis, because Nader has failed to submit the requisite number of signatures by even the latter

deadline for minor political-party candidates and is therefore properly barred from having his name placed on the 2004 presidential ballot in Texas. *See Storer v. Brown,* 415 U.S. 724, 736–37, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). "[I]f a candidate is absolutely and validly barred from the ballot by one provision of the laws, he cannot challenge other provisions of election laws as applied to other candidates." *Id.* at 737, 94 S.Ct. 1274.

at 182. If, however, state law imposes only "reasonable," "nondiscriminatory" restrictions upon the First and Fourteenth Amendment rights of voters, the state's important regulatory interests are generally sufficient to justify the restrictions imposed. *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059. *See also Anderson,* 460 U.S. at 788, 103 S.Ct. 1564; *Kirk,* 84 F.3d at 182.[13]

Each case must be resolved on its own facts, after due consideration is given to the practical effect of election laws of a given state, viewed in their totality. *Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). "We start with the proposition that the requirements for an independent's attaining a place on the general election ballot can be unconstitutionally severe." *Storer,* 415 U.S. at 738, 94 S.Ct. 1274 (citing *Williams,* 393 U.S. at 34, 89 S.Ct. 5). Therefore, this Court must determine the nature, extent, and likely impact of the Texas requirements. *Id.* In *Anderson* the Supreme Court applied a more severe level of scrutiny because, among other factors, the burden was magnified by the implications of a national election contest for president of the United States. Although this Court finds the national-election implication an important factor, and indeed it is present here, the Court notes that it remains but *one* factor in deciding what level of scrutiny the Court must apply. *See Anderson,* 460 U.S. at 789, 103 S.Ct. 1564 (reviewing court must weigh all factors). *See also Dart v. Brown,* 717 F.2d 1491, 1504 (5th Cir.1983). The Supreme Court in *Anderson* also considered a factor that does not exist under Texas's election laws: in Ohio petition signatures had to be sub-

mitted *before* the primary election. In addition, at the time of *Anderson,* there was no March "Super Tuesday," which has resulted in many states' presidential primaries, including Texas's, to be held much earlier in the year. *See Kirk,* 84 F.3d at 186. This phenomenon has resulted not in imposing fewer days to gather signatures on candidates or parties seeking ballot access by petition, but in moving the period for signature gathering to around the new primary date. Thus, the burdens imposed by the Ohio regulations in *Anderson* potentially had a greater impact on the nationwide election process than those present here. At the time of *Anderson,* an Ohio independent presidential candidate was required to file his petition by March 20, *see* 460 U.S. at 782, 103 S.Ct. 1564, well before Ohio's June 3 primary, *see id.* n. 1, 103 S.Ct. 1564, and a month before the plaintiff, John Anderson, announced his candidacy, *id.* at 782, 103 S.Ct. 1564. It was thus impossible for Anderson to qualify under Ohio law. By 2004 Ohio had succumbed to the "Super Tuesday" trend, holding its presidential primary election on March 2.

More restrictive signature and deadline requirements for an independent candidate may be justified if the ballot-access requirements, as a whole, are reasonable and similar in degree to those for a minor political-party candidate. *See Storer,* 415 U.S. at 745, 94 S.Ct. 1274. In Texas the ballot-access requirements for independent candidates and minor political-party candidates differ significantly, but yet, in the final analysis, are similar in degree. Minor political parties seeking to field presidential candidates are subject to extensive regulation under the Texas Election Code.

---

**13.** The Court has considered the pre-*Burdick* cases cited by the parties, including *Cromer v. South Carolina,* 917 F.2d 819 (4th Cir.1990), but finds that they are not persuasive as the Court must consider *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) in the light of *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

For example, minor political parties must establish a state executive committee, a county executive committee for each county in which the party will hold a county convention, precinct chairs for those precincts in which the party will hold a precinct convention, and provide by rule for the selection of a chair of the state executive committee and each county executive committee. TEX. ELEC.CODE ANN. § 181.004.[14] Minor political parties must also register with the Secretary of State by January 2 of the election year. *Id.* § 181.0041. Of greater significance, individuals seeking to be a party's nominee for a political office must file an application with the party by 5:00 p.m. on January 2, preceding the convention. *Id.* §§ 181.031– .033. Thus, qualifying Texas political parties' presidential candidates' identities were known by January 2, 2004, over seven weeks before Nader announced his candidacy on February 22. A potential independent presidential candidate therefore enjoys more flexibility in determining whether to run than does the candidate of a minor political party.

An independent candidate is not subject to a convention process as are minor political parties. An independent candidate has only one requirement to meet to secure ballot access for a presidential election in Texas. He must file by the second Monday in May an application and petition containing signatures equal in number to one percent of the total votes cast in Texas for president of the United States in the last presidential election. *Id.* § 192.032(c) and (d). Taking into consideration the additional requirements imposed upon minor political-party candidates under Texas election laws, the variance between the ballot-access requirements for independent candidates and minor political-party candidates is not sufficiently severe to warrant strict scrutiny.

## B. Reasonable and Similarly Situated

Differing requirements may be justified when the candidates are not similarly situated, thereby rendering statutory restrictions reasonable and nondiscriminatory even when there is a disparity between the requirements for independent and minor political-party candidates. Equal protection requires that similarly situated individuals should be treated alike. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

> The Equal Protection Clause allows the States considerable leeway to enact legislation that may appear to affect similarly situated people differently. Legislatures are ordinarily assumed to have acted constitutionally. Under traditional equal protection principles, distinctions need only be drawn in such a manner as to bear some rational relationship to a legitimate state end. Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them. See, *e.g., McDonald v. Board of Election Comm'rs,* 394 U.S. 802, 808–809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); *McGowan v. Maryland,* 366 U.S. 420, 425–426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

*Clements,* 457 U.S. at 962–963, 102 S.Ct. 2836. When the individuals are not simi-

---

**14.** Texas contains 254 counties and, according to one source, 8,428 voting precincts. *See* Bill Bishop, *The Incredible Shrinking Middle Ground,* Austin Am.-Statesman, Aug. 29, 2004, at A1. The Court recognizes that the likelihood of a minor political party's holding county conventions in all Texas counties or precinct conventions in all voting precincts is remote. However, the Court also recognizes that in enacting a law of statewide application, the legislature must take such contingencies into account.

larly situated, however, they need not be treated alike. Thus, a disparity among the level of the restrictions can be upheld as reasonable and nondiscriminatory.

A common rationale for upholding the disparity is that independent and minor political-party candidates are not similarly situated under a state's election laws. *See e.g., Delaney v. Bartlett,* No. Civ. 1:02 CV 00741, 2004 WL 1689757, at *6, n. 15 (M.D.N.C. Jul. 26, 2004). In some case, courts have justified the disparity based on the political party's organizational burdens and additional requirements not applicable to independents. *See Arutunoff v. Oklahoma State Election Bd.,* 687 F.2d 1375, 1380 (10th Cir.1982) (upholding disparity between minor party and independent requirements because "a political group becoming a recognized political party and offering to the electorate a slate of candidates is far different than one individual becoming an independent candidate to run for a particular office."); *Stevenson v. State Bd. of Elections,* 638 F.Supp. 547, 554 (N.D.Ill.1986) (upholding disparities in ballot access requirements between parties and independents because party candidates create an entire party platform, run with a slate of candidates, and "[have] responsibilities which extend beyond those contemplated by an independent").

"[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." *Storer,* 415 U.S. at 745, 94 S.Ct. 1274. An independent candidacy allows an individual to campaign alone without the necessity of establishing a new political party. A person seeking to establish a new party, on the other hand, abdicates independence and individuality to create a distinct political organization. The political-party candidate runs with a slate of responsibilities that extend beyond those contemplated by an independent. Thus, a state need not treat minor political-party candidates and

independent candidates identically in order for state laws to withstand constitutional challenge. *See Arutunoff,* 687 F.2d at 1380.

Political parties, whether they be major, medium, or minor, are subject to additional regulation not imposed upon independent candidates seeking ballot access in Texas. For example, minor political-party candidates are subject to a process of precinct conventions. TEX. ELEC.CODE ANN. §§ 181.002, 003, .061. This winnowing process is necessary in order to eliminate frivolous candidates and field only serious candidates. They must be nominated by submitting to the Secretary of State a list of precinct-convention participants, equal to at least one percent of the total number of votes received by all candidates for governor in the most recent gubernatorial election, and including each participant's residence address and voter registration number. *Id.* § 181.005(a). These lists must be submitted no later than the seventy-fifth day after the date of the precinct conventions, *id.,* two weeks later than when an independent candidate must file his application and petition signatures, *see id.* § 192.032. If a party conducts precinct conventions in even a fraction of the over 8,000 precincts in Texas, compiling the list of participants is no small task. The independent presidential candidate is not subject to this elaborate process. Thus, it is not unreasonable that an independent candidate is subject to presenting his nominating petition by an earlier date. Indeed, it could be argued that a minor-political party and its candidate require the additional two weeks to compile precinct participant lists and to supplement with petition signatures if necessary.

Nader urges that Texas's May 10 independent presidential candidate petition filing deadline is the earliest in the United States, with forty-six states and the Dis-

trict of Columbia having deadlines in July or later, and thirty states and the District of Columbia having deadlines in August or later. The filing deadline for minor political-party candidates emanates from and is driven by the date of the primary election in a presidential year. *Id.* §§ 41.007(c), 181.005(a), .006(b)(3), .061(c). Until 1959 Texas held its presidential primary in July. That year the Texas Legislature, at the behest of then Senator Lyndon Baines Johnson, who was contemplating running for president in 1960, advanced the date of the primary to May.[15] *See* Act of May 12, 1959, 56th Leg., R.S., ch. 165, § 1, 1959 Tex. Gen. Laws 335. In 1986 the legislature, "motivated by the desire to participate in the nationwide 'Super Tuesday' presidential primary," moved the primary to March. *Kirk,* 84 F.3d at 180.[16] "With the advent of 'Super Tuesday' all aspects of Texas political life have been ratcheted forward." *Id.* at 186. The *Kirk* court went on to hold that "[r]equiring minor parties and independent candidates to meet constitutional petitioning requirements at an earlier stage is not a severe burden." *Id.* Indeed, the Texas Legislature moved the petition deadline for independent candidates at the same time it changed the primary dates. Independent candidates originally were required to file their petition signatures with the Secretary of State in July. *See* Act of May 25,

1977, 65th Leg., R.S., ch. 240, § 170b, 1977 Tex. Gen. Laws 647 (petition deadline for independent candidates second Monday in July). Effective September 1, 1987, the petition-signature deadline was moved to May. *See* Act of Oct. 15, 1986, 69th Leg., 3d C.S., ch. 14, § 27, 1987 Tex. Gen. Laws 557, 583. The desire by states to participate in increasingly earlier primaries and be a part of "Super Tuesday" has in fact "ratcheted forward" much more than Texas political life. The political life of the entire country has been affected. In 2004 twenty-three states and the District of Columbia selected delegates committed to presidential candidates by either primary or caucus held on or before March 9. It is a simple reality that the selection of presidential candidates occurs much earlier today than in the not too distant past. This reality was recognized by the Fifth Circuit Court of Appeals in *Kirk* in holding that earlier-stage petitioning requirements are not a "severe burden." *Kirk,* 84 F.3d at 186. The Court therefore concludes that Texas's election laws are reasonable in drawing a distinction between the requirements imposed upon independent candidates and minor political-party candidates.

Concluding that the challenged signature and date requirements are reasonable, nondiscriminatory restrictions on the rights of voters, the Court must next de-

---

**15.** "The legislature passed the 'Lyndon Johnson Bill' to advance the date of political party primaries to May with runoffs in June, from the traditional July–August schedule. The idea was to give LBJ, the Senate Democratic majority leader, an opportunity to attend the 1960 presidential convention with a new six-year term nomination for the Senate in his pocket." RICHARD MOREHEAD, 50 YEARS IN TEXAS POLITICS 140 (Eakin Press 1982).

**16.** The primary was originally the fourth Saturday in July. *See* Act of June 28, 1951, 52d Leg., R.S., ch. 492, § 181, 1951 Tex. Gen. Laws 1097, 1167. The legislature later moved the date to the first Saturday in May

(Act of May 12, 1959, 56th Leg., R.S., ch. 165, § 1, 1959 Tex. Gen. Laws 335), then to the second Tuesday in March (Act of Oct. 15, 1986, 69th Leg., 3d C.S., ch. 14, § 1, 1987 Tex. Gen. Laws 557, 583), and the first Tuesday in March (Act of Jun. 18, 2003, 78th Leg., R.S., ch. 292, § 1, 2003 Tex. Gen. Laws 1262), where it remains today (TEX. ELEC.CODE ANN. § 41.007(c) (West Supp.2004)), with the exception that in 2004 the legislature established March 9, the second Tuesday in March, as the presidential primary date for that year only (Act of Oct. 13, 2003, 78th Leg.3d C.S., ch. 1, § 6(a)(2), 2003 Tex. Sess. Law Serv.3d C.S., ch. 1 (H.B.1)).

termine whether these restrictions are justified. Having found that the burdens imposed by these restrictions are not severe, the state need not present narrowly-tailored regulations to advance a compelling state interest, but only must show that the restrictions serve important state interests. *See Burdick,* 504 U.S. at 434, 112 S.Ct. 2059; *Kirk,* 84 F.3d at 186. Texas presents several legitimate interests to support these restrictions. The independent candidate ballot-access requirements preserve the integrity of the electoral process and regulates the number of independent candidates on the ballot by ensuring that (1) the electorate is enough aware of the candidate either to know his views or to learn and approve of them in a short period, and (2) that at least a minimum of registered voters are willing to take him and his views seriously. These justifications advanced by the State of Texas for the signature and date requirements are sufficient under the standard announced in *Anderson and Burdick.* Therefore, the Court concludes that the requirements of the Texas Election Code for ballot access by an independent presidential candidate are reasonable, nondiscriminatory, and constitutional as based upon the Texas's important regulatory interests.

### III. Conclusion

Although Nader dresses his argument in different clothes, the argument remains much the same as presented in *Kirk* and *White.* Those cases upheld as constitutional the Texas Election Code's time frame and number-of-signature requirements for candidates seeking a place on Texas's general-election ballot. That those requirements are somewhat different for independent presidential candidates than minor political parties does not unconstitutionally burden either Nader or the electorate. Nor does the disparity · in those requirements deny Nader equal protection. Standing alone, each requirement satisfies the mandate of the Constitution.

Considered together, they do not create the manifest injustice and discrimination urged by Nader and satisfy the test of *Anderson–Burdick.*

For the foregoing reasons, the Court **DECLARES** sections 192.032(a), 192.032(b)(3)(A), 192.032(c), and 192.032(d) of the Texas Election Code are legal and constitutional and **ORDERS** that Plaintiffs take nothing by their action.

**IT IS FURTHER ORDERED** that any further relief not expressly granted is **DENIED**.